UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **BRIAN BENDEROFF,** | **2:23-CV-12824-TGB-DRG** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **ERIK JOHANSEN, JEFFREY ADAMISIN, JOSEPH PRESLEY, MICHAEL WILLIAMS, BRIAN HELMERSON, MARK VAUGHAN, DEVALLONS DESMARETS, JEROME DEAVEN, and CHRIS WALTER,** | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (ECF NO. 26)** |
| Defendants. | |

In this civil rights case, Plaintiff Brian Benderoff alleges that he was unlawfully detained after he arrived at Detroit Metropolitan Airport by Defendant state and federal law enforcement officers and thereafter maliciously prosecuted for more than six years in violation of the Fourth and Fifth Amendments to the United States Constitution. Now before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint. ECF No. 26. The motion has been fully briefed. Upon review of the parties' filings, the Court concludes oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the present motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons stated below, Defendants' motion to dismiss will be **GRANTED**.

1

# I.   BACKGROUND

## A. Factual Background

### 1. Benderoff's June 23, 2016 Encounter with Defendants

According to the allegations in Plaintiff's First Amended Complaint, on June 23, 2016, Plaintiff Brian Benderoff took a flight from Las Vegas to Detroit carrying nearly $1,000,000 in cash he won playing blackjack at Caesars Palace. First Amended Complaint ("FAC") ¶ 14, ECF No. 25. The cash was wrapped in Caesars Palace wrappers and was accompanied by documentation of the funds as lawful winnings. *Id.* Benderoff was accompanied on the flight by Dr. William Gonte, who also carried wrapped and documented cash proceeds in his carry-on bag. *Id.* At the airport in Las Vegas, Transportation Security Administration ("TSA") officials stopped Gonte to inquire about the cash in his bag. *Id.* ¶ 15. Benderoff and Gonte were then permitted to proceed to the flight. The TSA officers recorded their contact with Gonte in a TSA blotter and also notified the Homeland Security Investigations ("HSI") hotline that Gonte was carrying $200,000 to $250,000 in cash. *Id.* ¶¶ 15–16. TSA's report did not mention Benderoff. *Id.* ¶ 16.

When Benderoff's and Gonte's flight landed in Detroit, Benderoff was met by four law enforcement officers with a police dog. *Id.* ¶ 17. Defendant Erik Johansen, who was part of a state/federal joint task force, motioned to Benderoff and said something along the lines of "We need to speak with you." *Id.* Benderoff asked Officer Johansen why the officers

wanted to question him and Officer Johansen commanded Benderoff not to speak. *Id.* ¶ 22. The officers then escorted Benderoff away from the gate area and an officer seized Benderoff's carry-on bag. *Id.* ¶ 23.

Benderoff asked to use the bathroom, and Defendant Officer Joseph Presley accompanied him. *Id.* ¶ 24. As Benderoff sat in the stall sending a text message to his then-attorney, Officer Presley asked Benderoff "What are you doing? Hurry up." *Id.* When Benderoff left the restroom, the officers escorted him to the baggage claim area. *Id.* ¶ 25. He identified his checked luggage and the officers grabbed the luggage from the carousel and took it into custody. *Id.* Officer Johansen then directed Benderoff to a government vehicle driven by Defendant Agent Michael Williams, and the three proceeded to the HSI Prisoner Processing Unit located about two miles from the airport. *Id.* Benderoff then spent the next ten and a half hours, from approximately 1:00 to 11:30 p.m., at the facility in the custody of HSI agents. *Id.* ¶ 28.

Once at the HSI facility, Agent Williams asked Benderoff to sign a *Miranda* waiver, which he did. *Id.* ¶ 32. Defendants Williams and Presley then questioned Benderoff about the source of his funds. *Id.* Defendant Officer Jeffrey Adamisin also searched Benderoff's luggage. *Id.* ¶ 27. While at the HSI facility, Benderoff was kept either in the "Prisoner Processing" area or in a small prisoner's cell which required an officer's key card to enter and which lacked a doorknob on the inside. *Id.* ¶¶ 28,

33. Benderoff asked many times to go home, and Defendants either rejected his requests or stated that they were "working on it." *Id.* ¶ 33.

Later in the day, Defendant Agents Brian Helmerson, Mark Vaughan, Devallons Desmarets, and Jerome Deaven questioned Benderoff. *Id.* ¶ 34. Defendant Helmerson told Benderoff he could leave if he provided "something good." *Id.* Throughout the day, Defendant Chris Walter performed "cell checks" of Benderoff and Gonte. *Id.* ¶ 35. Finally, around 11:00 p.m., when Defendants Helmerson and Desmarets were questioning Benderoff, he signed a consent form permitting search of his cell phone, iPad, and email, and he also provided information "implicating himself" in a life insurance transaction involving himself, Gonte, and a third person in 2010 or early 2011 "which Defendants took to be part of a scheme to commit wire fraud." *Id.* ¶ 36. Benderoff was then permitted to leave the HSI building, although Defendants kept his iPhone and iPad. *Id.* ¶ 38.

## 2. The criminal proceedings

Over four years later, on August 26, 2020, a grand jury indicted Benderoff and Gonte on multiple counts of wire fraud affecting a financial institution under 18 U.S.C. § 1343. *Id.* ¶ 40; *United States v. Gonte*, No. 20-cr-20380, (E.D. Mich. Aug. 26, 2020), Indictment, ECF No. 1. The grand jury found probable cause that Benderoff and Gonte took part in a scheme "to obtain money and enrich themselves by, among other things, inducing    entities    to    purchase,    through    false    and    fraudulent

4

representations, life insurance policies in which the life of OWNER A'S MOTHER was insured." *Gonte*, Case No. 20-cr-20380, Indictment ¶ 24, ECF No. 1. The grand jury further found that the fraudulent transactions affected a financial institution, Wells Fargo Bank, N.A., which took ownership of certain fraudulently-sold insurance policies. *Id.* ¶ 58.

In April 2021, Benderoff moved in the criminal case to suppress the statements he made during the June 2016 interaction with Defendants and "other evidence seized, … including information extracted from [his] iPhone and iPad," arguing that the evidence was seized and statements were made involuntarily after his "unlawful arrest." *Gonte*, Case No. 20-cr-20380, Motion, ECF Nos. 40, 110; FAC ¶ 43. The United States opposed the motion and offered evidence—including declarations from Defendants Johansen and Williams—that the June 2016 interaction was entirely consensual. *Gonte*, Case No. 20-cr-20380, Response, ECF Nos. 138, 138-3, 138-4; FAC ¶ 43. According to Benderoff, the Defendants falsely stated that Benderoff was "in good spirits" at the facility and had "absolutely no evidence to corroborate [his] claim that he was held in a locked cell for over nine hours against his will." FAC ¶ 43.

Benderoff also moved to dismiss the indictment, arguing that the charges were barred by the statute of limitations. *Gonte*, Case No. 20-cr-20380, Motion, ECF No. 124. Benderoff claimed that the fraud scheme did not affect a financial institution, making the charged conduct subject to a five-year statute of limitations (instead of the ten-year period for wire

fraud that affects a financial institution). The government filed a response in opposition, contending that the charged conduct affected Wells Fargo (as the grand jury determined). *Id.* Response, ECF No. 134.

In September 2022, the court (District Judge Nancy G. Edmunds) granted Benderoff's motion to dismiss the indictment, concluding that the charged conduct did not affect a financial institution because Wells Fargo only held the policies as an escrow agent. *Id.* Order, ECF No. 151, PageID.2922.

### B. Procedural History

On November 6, 2023, Benderoff filed the instant action alleging claims for unlawful detention and malicious prosecution under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the United States Constitution. ECF No. 1. The Defendants filed a motion to dismiss that Complaint, ECF No. 23, and Benderoff responded by filing a First Amended Complaint. FAC, ECF No. 25.

Defendants then filed a motion to dismiss the amended complaint. ECF No. 26. Defendants argue that, at the times relevant to Benderoff's claims, Defendants were either employed by the Department of Homeland Security ("DHS") or participating in a DHS task force known as the U.S. Immigration and Customs Enforcement ("ICE") HSI Outbound Currency Airport Task Force, which was based out of Detroit Metropolitan International Airport. Specifically, Defendants Williams, Helmerson, Vaughan, Desmarets, Deaven, and Walter were agents with

HSI, a component of DHS, and Defendants Johansen, Adamisin, and Presley were operating as part of the task force. Defendants argue that Benderoff's claims fail because he is seeking an improper extension of a cause of action allowed against federal agents under the *Bivens* line of Supreme Court cases. Defendants further argue that Benderoff's unlawful detention claim is barred by the statute of limitations and because Benderoff fails to allege a violation of a clearly established right. Defendants contend that Benderoff's malicious prosecution claim fails because the grand jury found probable cause to indict him and he was not seized as a result of the prosecution. In addition, the claim is barred by qualified immunity because it relies on allegedly false statements made in his criminal case.

Benderoff filed a response in opposition to Defendants' motion. ECF No. 27. Benderoff argues that his *Bivens* claims are not barred because they allege "run-of-the mill" Fourth Amendment violations associated with routine law enforcement. He further disputes that his unlawful detention claim is barred by limitations, contending that Defendants fraudulently concealed their knowledge that Benderoff was in fact unlawfully detained. And he also argues that his claims are not barred by qualified immunity, and that Defendants are not entitled to witness immunity for statements they made in the criminal proceedings. Finally, he disputes that Defendants Johansen, Adamisin, and Presley were federal rather than state actors.

Defendants filed a reply brief, arguing that Benderoff's response does not defeat their motion to dismiss. ECF No. 29

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Id.* at 539 (internal citations and quotation marks omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; *see also Agema v. City*

*of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) ("To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is the defendant who "has the burden of showing that the plaintiff has failed to state a claim for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829–30 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings…. [C]ourts may also consider public

records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.").

## III.   DISCUSSION

### A. Whether Defendants Johansen, Adamisin, and Presley are state actors or federal actors

Plaintiff asserts claims for unlawful detention and malicious prosecution pursuant to 42 U.S.C. § 1983 against Defendants Johansen, Adamisin, and Presley. FAC, Counts I and III. Section 1983 creates a cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege that (1) a right secured by the Constitution or a federal statute has been violated and (2) the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

In response, Defendants contend that they are all either federal employees or members of a federal task force, and thus Counts I and III of the FAC should be dismissed. Benderoff responds that although he has plead that Officer Johansen "was part of a state/federal joint task force" on the day in question, FAC ¶ 17, he has also alleged that Defendants Johansen, Adamisin, and Presley were local law enforcement officers, and he has not made any allegation that any of these three officers were full-time employees of a federal task force. He contends that, for purposes of this motion to dismiss, these three Defendants are *state* rather than federal actors. He concedes that "[i]f discovery proves that Officers

Johansen, Adamisin, and Presley were in fact employed under an arrangement that exposes them to liability only under *Bivens* rather than § 1983, then Plaintiff will at that time seek leave to amend" his complaint to assert *Bivens* claims against those officers. ECF No. 27, PageID.218–19.

The Court will first address Defendant Johansen, who Benderoff alleges "was part of a state/federal joint task force" and working with the Defendant DHS agents during the alleged events on June 23, 2016. In *Petty v. United States*, 80 F. App'x 986 (6th Cir. 2003), the Court of Appeals for the Sixth Circuit stated that federally deputized local law enforcement officers are federal actors, pointing out that a city police officer assigned to a multi-jurisdictional task force was considered a federal employee for purposes of the Federal Tort Claims Act ("FTCA") "[b]y virtue of his assignment to an FBI-operated task force," while other city police officers involved in the same incident who were not attached to the task force were not subject to the FTCA "because they [were] not federal employees." *Id.* at 987–90. *See also King v. United States*, 917 F.3d 409, 433 (6th. Cir. 2019) (finding no § 1983 action available against the defendant working full time with an FBI task force at the time of the incident at issue rather than in her role as a state detective), *rev'd on other grounds sub nom. Brownback v. King*, 592 U.S. 209 (2021); *Jakuttis v. Town of Dracut*, 95 F.4th 22, 29 (1st Cir. 2024) (affirming dismissal of § 1983 claim when "from the face of the complaint, the 'nature and

circumstances' of Poirier's alleged retaliatory conduct were related to 'the performance of his official duties' to the [Drug Enforcement Administration's ("DEA") Cross Borders Initiative ("CBI")] rather than to the Massachusetts state police"); *Yassin v. Weyker*, 39 F.4th 1086, 1090–91 (8th Cir. 2022) (finding no § 1983 action available against the defendant who was working on a federal task force rather than in her capacity as a state police officer at the relevant times).

In view of the relevant case law, Benderoff's § 1983 claims against Defendant Johansen must be dismissed because Benderoff's allegation that Johansen was "part of a state/federal joint task force" and working with the HSI agents at the times relevant to this case sufficiently alleges that he was a federal actor at that time.

Turning next to Defendant Adamisin, Defendants argue that Adamisin's July 19, 2016 report, which is quoted in paragraph 27 of the FAC and discussed in other paragraphs of the FAC, FAC ¶¶ 27, 46–47, states that he "was working at Detroit Metropolitan Airport as a Task Force Officer assigned to Homeland Security Investigations (HSI)." Adamisin Report, ECF No. 29-2. On a motion to dismiss, the Court may consider documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims. *Armengau*, 7 F. App'x at 344 ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the

pleadings….”). Benderoff quotes Adamisin's report and cites it as a basis for his allegation that Adamisin "knowingly and recklessly made false statements, whether oral or written, concerning the lawfulness of Mr. Benderoff's detention that were material to the continuation of Mr. Benderoff's prosecution." FAC ¶¶ 27, 46–47. The Court finds that Defendant Adamisin's report is referred to the FAC and central to Benderoff's claims of unlawful detention and malicious prosecution, and that it therefore can be considered by the Court on Defendants' motion to dismiss. That report establishes that Adamisin is a member of the joint task force and therefore a *federal*, not state, actor for purposes of this case. Accordingly, Benderoff's § 1983 claims against Adamisin are dismissed.

Finally, Benderoff's allegation in his FAC that Defendant Presley is employed by the Wayne County Airport Authority is demonstrably false. Presley was employed by the Department of Homeland Security at the time of the events in this case, not the Wayne County Airport Authority. *See* Presley SF-50 Notification of Personnel Action, ECF No. 29-3. The Court may take judicial notice of this U.S. Office of Personnel Management Standard Form Notification of Personnel Actions as to Presley, showing that he was a federal employee of the U.S. Customs and Border Patrol at the times relevant to this case because it is an official record and its contents cannot reasonably be questioned. See Fed. R. Evid. 201(b)(2) ("A judicially noticed fact must be one not subject to

reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see also Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010) (taking judicial notice of "the existence of" naturalization applications "because they are official agency records"); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276–78 (11th Cir.1999) (court may take judicial notice of official public records and may base its decision on a motion to dismiss on the information in those records). Moreover, although the court owes the complaint a presumption of truth, it need not accept as true that which is demonstrably false. *See Francis v. Giacomelli,* 588 F.3d 186, 195 (4th Cir. 2009) (granting motion to dismiss where the allegations were "patently untrue."). Accordingly, Presley is a federal, not state, actor and Benderoff's § 1983 claims against him are dismissed.

Because Defendants Johansen, Adamisin, and Presley were federal actors at the time relevant to this case, Benderoff's § 1983 claims in Counts I and III of his FAC against those Defendants will be **DISMISSED**.

### B. Plaintiff's *Bivens* Claims

While Congress created 42 U.S.C. § 1983 to provide a claim for damages when a state official violates an individual's constitutional rights, "Congress did not create an analogous statute for federal officials." *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017). However, in 1971, the Supreme Court created an implied cause of action for monetary damages

14

against federal officials who violate the Fourth Amendment by executing a warrantless search of a plaintiff's home. *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Private causes of action for damages against federal officials for constitutional violations have since become known as *Bivens* actions.

"Over the following decade, the Court twice again fashioned new causes of action under the Constitution—first, for a former congressional staffer's Fifth Amendment sex-discrimination claim, see *Davis v. Passman*, 442 U.S. 228 [ ] (1979); and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, see *Carlson v. Green*, 446 U.S. 14 [ ] (1980)." *Egbert v. Boule*, 596 U.S. 482, 490–91 (2022). However, in the 45 years since these three cases were decided, the Supreme Court has not implied *any* additional cause of action under the Constitution. The Supreme Court recognizes that "[a]t bottom, creating a cause of action is a legislative endeavor." *Egbert*, 596 U.S. at 491. In fact, the Supreme Court has expressly cautioned that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 582 U.S. at 134. The Supreme Court has even declared that if it "were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. at 502; *id.* at 504 (Gorsuch, J., concurring) (opining that the majority has left "a door ajar and [held] out the possibility that someone, someday might walk through it even as it devises a rule that ensures no one ... ever will.") (internal quotation

marks omitted). But because the Supreme Court has declined to overrule *Bivens*, it remains good law and governs this case.

The Supreme Court has devised a two-part inquiry to determine when the Court should engage in the "disfavored judicial activity" of recognizing a new *Bivens* action. *See Egbert*, 596 U.S. at 492. The framework asks:

> (1) Does the case present a new context meaningfully different from *Bivens*, *Davis*, and *Carlson*?
>
> (2) If so, do "special factors" indicate that "the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed'"?

*Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). If the answer to both questions is "yes," then a *Bivens* action is unavailable. The Supreme Court has noted, however, that the two inquiries "often" collapse into one: "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*

As to the first inquiry, the Supreme Court has prepared a non-exhaustive list of differences that "may" be "meaningful":

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

16

*Ziglar*, 582 U.S. at 140. In addition, a case may be meaningfully different when "a new category of defendants" is sued. *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). And importantly, a *Bivens* "claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* at 103. As the Sixth Circuit explains, the "context is new if it differs in virtually any way from the *Bivens* trilogy." *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 883 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 301 (2022).

With respect to the second inquiry, the Court considers whether any special factors counsel against extending a cause of action. *Ziglar*, 582 U.S. at 136. The Supreme Court has "not attempted to 'create an exhaustive list' of factors that may provide a reason not to extend *Bivens*," but it has explained that the separation of powers should be a guiding light. *Hernandez*, 589 U.S. at 102. Accordingly, the Supreme Court instructs that the courts must not create a cause of action if there is "a single sound reason to defer to Congress." *Egbert*, 596 U.S. at 491 (citing *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 635 (2021) (citing *Hernandez*, 589 U.S. at 102)). "[T]he most important question is who should decide whether to provide for a damages remedy, Congress or the courts?" *Hernandez*, 589 U.S. at 114. "If there is a rational reason to think that the answer is 'Congress'—as it will be in most every case, ... no *Bivens*

17

action may lie." *Egbert*, 596 U.S. at 492 (internal citation omitted). "In sum, … unless a case essentially tracks the facts of *Bivens*, *Davis*, or *Carlson*, it will arise in a new *Bivens* context under the first prong, and nearly all such claims are doomed to fail on the second prong." *Enriquez-Perdomo v. Newman*, 740 F. Supp. 3d 560, 571 (W.D. Ky. 2024), *appeal filed*.

Defendants argue that Benderoff seeks an improper extension of *Bivens* in this case. Benderoff disagrees, claiming that he  instead raises "heartland *Bivens* claims." Applying the principles outlined above to the fact in this case, the Court finds that Benderoff's *Bivens* claim fails.

### 1. Step One: New *Bivens* Context

Defendants argue that Benderoff's Fourth and Fifth Amendment claims present a new *Bivens* context because the Defendants here were DHS agents or task force officers, a "new category of defendants," *Malesko*, 534 U.S. at 68, as compared to the narcotics agents in *Bivens*, and Defendants were enforcing a different mandate—protecting homeland security, securing the nation's air, land, and sea borders, and preventing illegal activity. Defendants further argue that the facts of this case—involving an encounter at an airport—differ from those in *Bivens*, involving a warrantless search of a home. Benderoff on the other hand contends that his claims do not arise in a new context, but instead are "run-of-the mill" Fourth Amendment claims, and thus "heartland" *Bivens* claims.

The Court first notes that just because Benderoff here asserts Fourth and Fifth Amendment claims, the same constitutional provisions at issue in *Bivens* and *Davis*, that alone does not demonstrate that these claims would be a permissible extension of *Bivens*. It is settled law that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 589 U.S. at 103. Where a proposed claim presents "even a modest extension" of the factual or legal circumstances at issue in *Bivens* and its progeny, the claim arises in a new *Bivens* context. *Ziglar*, 582 U.S. at 147. It cannot reasonably be disputed that this case differs from *Bivens* and *Davis*. While Benderoff here alleges unlawful seizure and interrogation, those actions occurred at an international airport. The incident was not a search of Benderoff's home without a warrant and with him handcuffed in front of his family, as alleged in *Bivens*. "The information-gathering and case-building activities" alleged by Benderoff in this case "are a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*." *Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019). And the facts of this case are fundamentally different from those in *Davis*, a due process claim against a congressman for gender discrimination. Further, the Defendant agents/officers in this case were DHS agents or task force officers, not Federal Bureau of Narcotics agents like in *Bivens*.

19

Courts have held that these kinds of factual differences and dissimilar defendants constitute "meaningful" differences constituting a "new" *Bivens* context in other cases. *See Hernandez*, 589 U.S. at 103 (declining to create a damages remedy for an excessive-force claim against a Border Patrol agent who shot and killed a 15-year-old Mexican national across the border); *Elhady*, 18 F.4th at 885 (holding that *Bivens* is unavailable to Fifth Amendment claim by United States citizen against Border Patrol agents); *Sheikh v. U.S. Dep't of Homeland Security*, 106 F.4th 918, 925 (9th Cir. 2024) (dismissing *Bivens* claim against DHS HSI agents searching plaintiff's ranch while investigating illegal cross-border movement, pointing out that  plaintiff does not show "that [DHS] has the same mandate as agencies enforcing federal anti-narcotics law"); *Xi v. Haugen*, 68 F.4th 824, 834 (3d Cir. 2023) (finding new context where federal agents allegedly made false statements and material omissions of exculpatory evidence that led government to investigate, arrest, and prosecute plaintiff); *Enriquez-Perdomo*, 740 F. Supp. 3d at 571 (holding Fourth Amendment claims against Immigration and Customs Enforcement ("ICE") agents "differ starkly from *Bivens*"); *Dyer v. Smith*, 56 F.4th 271, 278 (4th Cir. 2022) (finding First and Fourth Amendment claims asserted against Transportation Security Administration ("TSA") agents for an interaction at the airport are "new *Bivens* claims"); *Boules v. United States*, No. 2:23-cv-08891, 2024 WL 4203832, at *4 (C.D. Cal. Sept. 16, 2024) ("While Plaintiff alleges unlawful seizure …, unlike in

20

*Bivens*, the alleged seizure did not occur in his own home without a warrant, and the defendant officer here was an agent of the Federal Protective Services (whereas in *Bivens*, the officers were agents of the Federal Bureau of Narcotics)."); *Leuthauser v. United States*, 576 F. Supp. 3d 806, 811 (D. Nev. 2021) (finding a new *Bivens* context where "the search [in *Bivens*] occurred at a private residence as part of traditional law-enforcement during a criminal investigation" and "the challenged conduct [in the instant case] occurred during an administrative search as part of a security checkpoint in a public airport" and "the federal officials in *Bivens* were operating under a statutory mandate entirely distinct from that of TSA screeners").[1] "Such differences alone make this a new *Bivens* context." *Sheikh*, 106 F.4th at

---

[1]    The Sixth Circuit Court of Appeals and courts in this District have recently held that even the search of a home pursuant to an arrest warrant is a sufficiently new context to set apart those cases from the warrantless search that was alleged in *Bivens*. *See Cain v. Rinehart*, No. 22-1893, 2023 WL 6439438, at *3 (6th Cir. July 25, 2023) (collecting cases and holding that existence of an arrest warrant created a new context); *Decker v. Infante*, No. 19-cv-11654, 2024 WL 1287784, at *8 (E.D. Mich. Mar. 26, 2024) (Leitman, J.) (finding a new *Bivens* context where *Bivens* addressed a warrantless entry into a home and the instant case involved entry into a home with an arrest warrant); *Pompy v. Moore*, No. 19-10334, 2024 WL 845859, at *10–11 (E.D. Mich. Feb. 28, 2024) (Lawson, J.) ("The existence of the warrant here calls for a different analysis invoking distinct rules of decision under the Fourth Amendment compared with the situation in *Bivens*. That sets this case apart and requires the Court to proceed to the second step of the threshold inquiry."), *appeal filed*.

925. Indeed, the Sixth Circuit noted in *Elhady* that every other circuit "faced with an invitation to expand *Bivens* to the border/immigration context has held firm" and refused to extend *Bivens* to those claims. *Elhady*, 18 F.4th at 886–87 (collecting cases).[2]

Against this deluge of case law, Benderoff pushes back and contends that unlike *Hernandez* and *Egbert*, there is no connection to foreign affairs or national security in this case because he was a United States citizen and he was detained on United States soil. However, this argument goes nowhere, because the citizenship of the suspect or the location of the arrest have not been held to be the determinative factors in deciding whether the investigation is driven by a national security-oriented mission. *Egbert* also involved a United States citizen and alleged constitutional violations on United States soil, as have a number of the cases cited above. Benderoff also asserts that his claims are more like those *Bivens* claims permitted by the Sixth Circuit in *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019). In *Jacobs*, the defendants were deputized U.S. Marshals who were searching for a fugitive in a house in which Jacobs lived with others. *Id.* at 1033. The Court of the Appeals for the Sixth Circuit found that the plaintiff's *Bivens* claim in that case did not arise

---

[2]     While the Sixth Circuit in *Elhady* noted that the Ninth Circuit was the only circuit court that had created a *Bivens* cause of action against a Border Patrol agent under the First and Fourth Amendments, the Supreme Court has since reversed that Ninth Circuit decision and held that there is no *Bivens* action in that case. *See Egbert*, 596 U.S. 482.

in a new context when it was based on a U.S. Marshals Service search of a home for a fugitive and the firing of shots at the plaintiff. The court determined instead that it was a "run-of-the-mill" challenge to "standard law enforcement operations that fall well within *Bivens* itself." *Id.* at 1033–34, 1038–39. A review of that case illustrates that it is by no means factually similar to this case. *Jacobs* concerned the actions of deputized U.S. Marshals enforcing criminal law—not HSI agents enforcing the legal mandate of the DHS—by conducting a home raid that resulted in a man being shot—not alleged detention and questioning at the airport. Moreover, *Jacobs* was decided before the Supreme Court's decisions in *Hernandez* (holding there was no *Bivens* action against U.S. Border Patrol agent) and *Egbert* (same), and the Sixth Circuit's decision in *Elhady* (same, and applying *Hernandez* to conclude that a "context is new if it differs in virtually any way from the *Bivens* trilogy"). *Jacobs* therefore does not control here.

Finding that Benderoff's claims here arise in a new *Bivens* context, the Court turns to the second inquiry—whether there are any special factors counseling hesitation in expanding *Bivens* remedies. *Egbert*, 596 U.S. at 492.

### 2. Step Two: Special Factors

The Court next asks if there is a single "rational reason" to think that Congress is better equipped to conduct a cost-benefit analysis and decide that a damage remedy is warranted in the context of this case. *See*

*Egbert*, 596 U.S. at 492. The Supreme Court cautioned that "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* (quoting *Hernandez*, 589 U.S. at 102).

The Supreme Court in *Egbert* first stated that "potential special factors" arise when a case involves a "new category of defendants" that "represent situations in which a court is not undoubtedly better positioned than Congress to create a damages action" because "[e]ven in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*." *Egbert*, 596 U.S. at 492–93. The Supreme Court stated "[t]hat uncertainty alone is a special factor that forecloses relief." *Id.* at 493 (citation omitted). Defendants here were HSI agents or task-force officers. Homeland Security Investigations ("HSI") is "a premier federal law enforcement agency within the Department of Homeland Security." https://www.ice.gov/about-ice/hsi  [https://perma.cc/JD8K-KRB5]. "HSI conducts federal criminal investigations into the illegal movement of people, goods, money, contraband, weapons and sensitive technology into, out of and through the United States," including investigating "financial fraud and scams." *Id.* "Matters intimately related to foreign policy and national security are rarely proper subjects to judicial intervention." *Haig v. Agee*, 453 U.S. 280, 282 (1981). Rather, "[n]ational-security policy is the prerogative of Congress and the President," and to

impose damages or liability is likely to "caus[e] an official to second-guess difficult but necessary decisions concerning national-security policy." *Ziglar*, 582 U.S. at 142.

While Benderoff discounts the agents' actions in this particular case, contending that there is no connection to foreign affairs or national security in the same sense as in *Hernandez* and *Egbert*, the Supreme Court in *Egbert* cautioned that "a court should not inquire, … whether *Bivens* relief is appropriate *in light of the balance of the circumstances in the 'particular case.'" Egbert*, 596 U.S. at 496 (emphasis added). "Rather, under the proper approach, a court must ask '[m]ore broadly' if there is any reason to think that 'judicial intrusion' into a *given field* might be 'harmful' or 'inappropriate,'" stating "we ask here whether a court is competent to authorize a damages action not just against Agent Egbert but against Border Patrol agents generally. The answer, plainly, is no." *Id.* (citing *Hernandez*, 589 U.S. at 108–09). Similarly, in this case, based on the types of investigations HSI carries out and their national security and foreign policy implications, the Court finds it is not competent to authorize a damages action against DHS HSI agents generally. *See Sheikh*, 106 F.4th at 927–28 ("[T]he question is not whether a court is competent to authorize a *Bivens* claim against a specific agent, but against that federal agency's agents generally.").

In addition, when considering this inquiry, the Court must be mindful that it "may not fashion a *Bivens* remedy if Congress already has

provided, or has authorized the Executive to provide, an alternative remedial structure." *Egbert*, 596 U.S. at 493; *Ziglar*, 582 U.S. at 145 ("[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not."). Although Congress has not authorized a cause of action for damages against federal HSI agents that Benderoff could bring, it has authorized alternative remedies. The existence of such remedies independently foreclose approving the creation of a *Bivens* action here. As the Supreme Court recognized in *Egbert*, the Secretary of Homeland Security is "statutorily obligated to 'control, direct[], and supervis[e] … all employees' [under] 8 U.S.C. § 1103(a)(2)" and "must investigate '[a]lleged violations of the standards for enforcement activities' and accept grievances from '[a]ny persons wishing to lodge a complaint' [under] 8 C.F.R. §§ 287.10(a)–(b)." *Egbert*, 596 U.S. at 497. These same remedial measures apply to Defendants here, who were operating under the Department of Homeland Security in this case.

Defendants also state that, when establishing the DHS, Congress expressly included an Office of Inspector General ("OIG"), 6 U.S.C. § 113(b), authorizing it to investigate, among other things, federal officer abuses of civil rights or civil liberties. 5 U.S.C. § 417. Congress established DHS's Office of Civil Rights & Civil Liberties ("CRCL"), 6 U.S.C. §§ 113(d)(3); 345, and instructed the OIG to refer to the CRCL any "civil liberties matters" that OIG does not investigate. 5 U.S.C. § 417. "Several courts have pointed to the existence of administrative and

statutory procedures, including the Department of Homeland Security's civil rights complaint process, as constituting an alternative remedy counseling against creation of *Bivens* remedies." *Boules*, 2024 WL 4203832 at *5 (collecting cases); *see also Sheikh*, 106 F.4th at 928–29 (recognizing that the existence of alternative remedial structures precluded *Bivens* action in claim against HSI agents); *Pettibone v. Russell*, 59 F.4th 449, 456 (9th Cir. 2023) (declining to extend *Bivens* because "[a]ggrieved parties can report any alleged misconduct to the Inspector General or the Department of Homeland Security, who must either investigate or refer the matter to the Officer for Civil Rights and Civil Liberties."). It does not matter if the alternative remedies do not provide all the relief Benderoff seeks. "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy. That is true even if a court independently concludes that the Government's procedures are 'not as effective as an individual damages remedy.'" *Egbert*, 596 U.S. at 498 (citing *Bush v. Lucas*, 462 U.S. 367, 372 (1983)).

For these reasons, the Court concludes that Benderoff's Fourth and Fifth Amendment *Bivens* claims in Counts II and IV of his FAC present a new context under *Bivens* and that special factors counsel against extending an implied cause of action here. Accordingly, Benderoff's

*Bivens* claims in Counts II and IV of his FAC will be dismissed for failure to state a claim.

The Court pauses for a moment to return to its disposition of Counts I and III of the FAC raising § 1983 claims against Defendants Johansen, Adamisin, and Presley under the assumption that they were state actors. As stated above, these claims were dismissed because those Defendants were actually federal actors against whom a § 1983 may not be brought. This disposition presents the logical question of whether a *Bivens* claim could be made against them as federal actors. Based on the same reasoning that the Court explains above, Benderoff's *Bivens* claims against these three Defendants would also be dismissed.[3]

### C. Unlawful Detention Barred by Limitations

Even if Benderoff could state an unlawful detention claim against any Defendant in this case, such a claim would be barred by the statute of limitations. The Court must look to state law to provide the statute of limitations for a *Bivens* claim and a § 1983 claim. *Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005). In Michigan, civil rights actions are subject to a three-year statute of limitations. *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 430 (6th Cir. 2016) (citing MCL § 600.5805(10)). However, federal law provides the accrual date for a civil

---

[3]     Because the Court dismisses Benderoff's claims for failure to state a claim, it need not address Defendants' arguments for qualified immunity.

rights cause of action. *Wallace v. Kato*, 549 U.S. 384, 387–88 (2007). A Fourth Amendment claim for unlawful detention or false arrest accrues, at the latest, when the plaintiff is no longer being unlawfully detained, either because he is released from custody or because his custody becomes lawful because approved by legal process. *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1162 (6th Cir. 2021) (citing *Wallace*, 549 U.S. at 388–90).

Here is it undisputed that Benderoff was released from the alleged unlawful detention on June 23, 2016. Accordingly, his unlawful detention claim accrued on that day. Benderoff did not bring this lawsuit until November 6, 2023, well over three years after his claim accrued. Defendants therefore contend that Benderoff's unlawful detention claim is barred by limitations.

In response, Benderoff suggests that the limitations period should be extended because he has sufficiently pleaded facts that Defendants fraudulently concealed the existence of the claim from him, and that he brought this lawsuit within two years of when he discovered, or should have discovered, the existence of his claim. Benderoff supports his position by citing Michigan law allowing such an extension of the limitations period for fraudulent concealment. See MCL § 600.5855. Benderoff alleges in the FAC that Defendants "ma[de] assertions from 2016 through July 2022 that Mr. Benderoff had not been detained or that his detention was consensual or otherwise lawful" and that "[i]t was not

29

until Agent Helmerson's July 20, 2022" statements suggesting that he believed Benderoff was detained on June 23, 2016, that Benderoff "discovered or could have discovered that, at the time of [his] detention, it was plainly obvious to officers in Defendants' position [he] had been unlawfully detained." FAC ¶ 54.

MCL § 600.5855 provides "[i]f a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations." Tolling for fraudulent concealment requires the plaintiff to demonstrate that the defendant actively concealed the claim. *Sills v. Oakland Gen. Hosp.*, 559 N.W.2d 348, 352 (Mich. App. 1996) (citing MCL § 600.5855). Mere silence or passive nondisclosure is insufficient; there must be an intentional effort to keep the plaintiff in the dark. *Doe v. Roman Cath. Archbishop of Archdiocese of Detroit*, 692 N.W.2d 398, 406–07 (Mich. App. 2004) ("[C]auses of action do not constitute fraudulent concealment [if] they amount to mere silence." (citation omitted)). In addition, a plaintiff must demonstrate due diligence in discovering his claim. "[T]he plaintiff must be held chargeable with knowledge of the facts, which it ought, in the

exercise of reasonable diligence, to have discovered." *Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 647–48 (E.D. Mich. 2014) (Michelson, J.) (quoting *Barry v. Detroit Terminal R.R. Co.*, 11. N.W.2d 867 (Mich. 1943)).

Based on the allegations in the FAC, it is clear that Benderoff knew, or should have known, of his alleged unlawful detention on June 23, 2016, because it states that he was brought to an offsite facility and spent ten and a half hours either involuntarily in "a small prisoner's cell … which required an officer's key card to enter, and which lacked a doorknob on the inside" or in the "Prisoner Processing area" and that he "*reasonably and correctly believed that he was detained* in that cell." FAC ¶¶ 25–38 (emphasis added). That claim is plainly grounded on events that occurred on June 23, 2016, and it says that Benderoff experienced, observed, and understood his own situation to be an alleged detention. *See Cooey v. Strickland*, 479 F.3d 412, 422 (6th Cir. 2007) ("[T]he test is whether he knew or should have known based upon reasonable inquiry, and could have filed suit and obtained relief."). Accordingly, the filing deadline for Benderoff's unlawful detention claim was June 23, 2019. And Benderoff's argument that he was justified in filing his lawsuit well past that deadline because he "needed *some* basis to plead that the facts of his detention plausibly entitled him to overcome qualified immunity" is without merit. Plaintiffs who delay filing actions for violations of their constitutional rights in the belief that they must first discover facts that

plausibly overcome qualified immunity will experience a very long, if not interminable, wait.

Accordingly, even if Benderoff could assert an unlawful detention claim against Defendants under *Bivens* or § 1983, that claim would be time barred.

### D. Malicious Prosecution

Finally, even if Benderoff could state a malicious prosecution claim against any Defendant, that claim would fail as a matter of law. Benderoff alleges that Defendants violated his Fourth, Fifth, and Fourteenth Amendment right to be free from malicious prosecution "by continuing or prolonging his prosecution when they knowingly or recklessly made false statements in 2022 to show that [he] was not detained on June 23, 2016, when in fact he was detained on that date." FAC ¶¶ 72–73. Benderoff pleads that "[b]ut for these false statements, [his] prosecution … would have terminated sooner than it did." *Id.* ¶ 74. He alleges that the prosecution was terminated in his favor and that there was no probable cause to support the prosecution. *Id.* ¶¶ 75–76.

To establish a Fourth Amendment claim for malicious prosecution, a plaintiff must prove four elements: (i) that a criminal prosecution was initiated against him, and that the defendants made, influenced, or participated in the decision to prosecute; (ii) that there was a lack of probable cause to support the prosecution; (iii) that the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (iv)

that the legal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

"[T]he gravamen of the Fourth Amendment claim for malicious prosecution … is the wrongful initiation of charges without probable cause." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). "[A] bindover determination after a preliminary hearing, or a grand jury indictment, proves the existence of probable cause sufficient to call for trial on the charge and forecloses a claim for malicious prosecution." *Parnell v. City of Detroit*, 786 F. App'x 43, 47 (6th Cir. 2019) (citing *King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017)). In this case, a grand jury indicted Benderoff on wire fraud affecting a financial institution thereby creating a presumption of probable cause. This forecloses his malicious prosecution claim. While that presumption may be rebutted if the officers "either knowingly or recklessly ma[de] false statements (such as in affidavits or investigative reports)" that was critical to the finding of probable cause or to the ultimate prosecution, *King*, 852 F.3d at 587, Benderoff fails to make such a showing here.

Benderoff makes the conclusory allegation that "[t]here was no probable cause to support [his] prosecution." FAC ¶ 68. He pleads that Defendants "knowingly or recklessly made false statements in 2022 to show that [he] was not detained on June 23, 2016, when in fact he was detained on that date," and that these false statements continued or prolonged his prosecution. FAC ¶¶ 72–73. However, Benderoff fails to

plead or explain how statements regarding his detention in 2016 prolonged or continued his prosecution for a wire fraud scheme involving the sale of life insurance policies that he was indicted for on August 25, 2020. As of August of 2020, a grand jury had found probable cause and issued a lawful indictment. His criminal case was ultimately dismissed not because he did not commit the charged conduct, but because the wire fraud charges were barred by the five-year statute of limitations and not the 10-year statute of limitations for fraud "affecting" a financial institution. The court found that Wells Fargo's role in the alleged fraudulent scheme was "akin to that of escrow agent in the initial transaction, which then services the account and provides fee-based administrative functions" but that the bank was not exposed to an actual risk of loss, which had to be shown in order to invoke the 10-year statute of limitations. *Gonte*, Case No. 20-cr-20380, Order, ECF No. 151. That dismissal had nothing to do with the Defendants' alleged statements regarding Benderoff's detention in 2016. In fact, that court found that Benderoff's motion to suppress statements he made on June 23, 2016 was mooted by the court's decision dismissing the case. Accordingly, Benderoff has failed to sufficiently plead facts to overcome the presumption of probable cause for his prosecution, and his malicious prosecution claim against Defendants is therefore foreclosed.

**E. CONCLUSION**

For all the reasons stated above, Defendants' Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 26, is **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE.**

This is a final order that closes the case.

**IT IS SO ORDERED.**

Dated: March 31, 2025          /s/Terrence G. Berg
                                        HON. TERRENCE G. BERG
                                        UNITED STATES DISTRICT JUDGE